IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

**JANIS FREY**

        Plaintiff,

v.

**MORNINGSTAR SENIOR LIVING, LLC,** and **MORNINGSTAR SENIOR MANAGEMENT, LLC**

        Defendants.

---

### COMPLAINT AND DEMAND FOR A JURY TRIAL

---

Plaintiff, Janis Frey ("Ms. Frey" or "Plaintiff"), by and through her undersigned counsel, complains against Defendants, MorningStar Senior Living, LLC, and MorningStar Senior Management, LLC (collectively, "MorningStar" or "Defendants"[1]), as follows:

### I.      PARTIES

1.      Ms. Frey, at all times material hereto, was a female citizen of the United States of America and the state of Colorado.

2.      Ms. Frey has black skin color and is African American.

3.      Ms. Frey was an employee of MorningStar from June 24, 2021, to November 5, 2021.

4.      MorningStar Senior Living, LLC, is a limited liability company authorized to do business in Colorado on August 30, 2005. MorningStar Senior Living, LLC, does business in Colorado under tradenames of MorningStar Senior Living.

---

[1] Upon information and belief, Plaintiff contends her employer was MorningStar Senior Living, LLC. At the Equal Employment Opportunity Commission, MorningStar Senior Management, LLC, filed a position statement and identified itself as Plaintiff's employer.

5.      MorningStar Senior Management, LLC, is a limited liability company authorized to do business in Colorado on September 22, 2005.

6.      MorningStar operates and manages senior housing communities.

7.      MorningStar has over 2,000 employees and operates in eleven (11) states of the United States.

## II.      JURISDICTION AND VENUE

8.      This Court has original jurisdiction of the subject matter asserted by the allegations contained in the complaint pursuant to 28 U.S.C. §§ 1331, 1343(a), 42 U.S.C. § 2000e-5 *et. seq.*, and 42 U.S.C. § 1981.

9.      The acts complained of herein were committed or had their principal effect within the District of Colorado, and therefore, venue for this civil action is proper pursuant to 28 U.S.C. §§ 1391(b)(e) and 706(f)(3) of Title VII, 42 U.S.C. § 2000e-5(f)(3).

## III.      ADMINISTRATIVE PROCEDURES

10.      Ms. Frey has fully complied with all administrative prerequisites of jurisdiction in this Court under Title VII.

11.      On November 8, 2021, Ms. Frey filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge Number 541-2021-03024.

12.      On November 10, 2022, Ms. Frey received a Dismissal and Notice of Right to Sue from the EEOC.

13.      Plaintiff has exhausted all administrative remedies and this action is timely filed.

## IV.      GENERAL ALLEGATIONS

14.      Ms. Frey incorporates by reference and realleges each and every allegation contained above with the same force and effect as if fully set forth herein.

**Ms. Frey Begins Her Employment with Defendants**

15.      Ms. Frey was hired by MorningStar on June 24, 2021, and began her employment on June 27, 2021.

16.      Ms. Frey was hired for the concierge position at the RidgeGate location.

17.      Ms. Frey was the only black employee at this location.

18.      Ms. Frey was subjected to a hostile work environment, which included being called and referred to as a "nigger."

19.      On her first day of employment, Director of Community Relations Marion Mauro ("Ms. Mauro") was demeaning and disrespectful to Ms. Frey in response to Ms. Frey's request for assistance with a copy machine.

20.      Ms. Mauro spoke aggressively to Ms. Frey, rudely stepped in front of her, stepped on her toe, and did not apologize.

21.      Lead concierge Terri Kaiser ("Ms. Kaiser"), who was training Ms. Frey, witnessed Ms. Mauro's actions and reported them to Dylon Knowlton-Rau ("Mr. Knowlton-Rau"), Director of Hospitality and Ms. Frey's supervisor.

22.      On July 7, 2021, Mr. Knowlton-Rau sent an email to Executive Director Ronda Lunnon ("Ms. Lunnon") stating that Ms. Mauro's behavior was "not radiant nor in line with our code of civility or core values."

23.      Ms. Kaiser requested a meeting with Ms. Frey, Ms. Mauro, and Ms. Lunnon to discuss the incident further.

24.      This meeting took place weeks later. In the meeting, Ms. Mauro stated that she speaks loudly because she is of Italian descent.

25.       Defendants' solution was to promote Ms. Mauro to a position with the corporate office.

**Harassment from Michelle Parrott and Kathleen Larsen**

26.     Michelle Parrott ("Ms. Parrott") was a fellow concierge at the MorningStar RidgeGate location during Ms. Frey's employment.

27.     Ms. Parrott is a white female.

28.     Ms. Parrott continually harassed and discriminated against Ms. Frey because of her race and the color of her skin during Ms. Frey's employment with MorningStar.

29.     Ms. Parrott repeatedly referred to Ms. Frey as a "nigger."

30.     Ms. Frey learned that Ms. Parrott referred to her as a "nigger" from other MorningStar employees during her employment.

31.     The harassment from Ms. Parrott began early on in Ms. Frey's employment when she requested that a driver complete a drive for a resident. Ms. Frey was not aware that this driver was only supposed to go on "life enrichment" drives.

32.     Ms. Parrott inappropriately yelled at Ms. Frey for this misunderstanding.

33.     Ms. Frey informed Mr. Knowlton-Rau of the incident, but to her knowledge, he did not take any action under Defendants' employment policies, including its Code of Civility.

34.     On several occasions, Ms. Parrott aggressively inquired to coworkers about who was giving Ms. Frey a ride home.

35.     Ms. Parrott displayed an inappropriate level of interest in who was driving Ms. Frey home.

36.     Ms. Parrott would also clock in and out late for her dinner break so that Ms. Frey could not clock out on time to receive a ride home.

37.     Ms. Frey brought this to the attention of Mr. Knowlton-Rau on several occasions.

38.     On August 15, 2021, Ms. Parrott and Ms. Frey had an overlapping shift that required a mandatory "crossover" communication or debriefing of current or ongoing issues concerning residents.

39.     When Ms. Frey attempted to initiate this communication, Ms. Parrott responded rudely and aggressively and failed to perform the crossover communication. Ms. Frey reported this behavior to Mr. Knowlton-Rau.

40.     On or around August 16, 2021, Ms. Frey requested to meet with Mr. Knowlton-Rau to discuss Ms. Parrott's continued harassment.

41.     Mr. Knowlton-Rau expressed concern with the number of meetings Ms. Frey was requesting.

42.     He did not meet with her regarding her concerns with Ms. Parrott.

43.     On September 2, 2021, Ms. Frey was getting cleaning supplies from Mr. Knowlton-Rau's office per his request.

44.     Ms. Parrott entered the office and aggressively demanded to know what Ms. Frey was doing in Mr. Knowlton-Rau's office.

45.     Ms. Frey did not want to engage with Ms. Parrott and chose not to respond to her question.

46.     Ms. Frey was bent in a crouched position when Ms. Parrott came up behind her and began yelling in her ear.

47.     Ms. Parrott yelled, "Excuse me! I'm talking to you!" at Ms. Frey.

48.     Ms. Frey was afraid for her safety due to Ms. Parrott's physical proximity and the tone and volume of her voice.

49.     Ms. Frey immediately reported this incident to Mr. Knowlton-Rau.

50.     Mr. Knowlton-Rau stated to Ms. Frey that "everyone has noticed a change in Michelle because 'her boy' lost the election, and now I hired you." Mr. Knowlton-Rau's reference was to President Trump.

51.     Ms. Frey was visibly upset, so Mr. Knowlton-Rau sent her home for the day.

52.     MorningStar did not investigate Ms. Frey's complaints against Ms. Parrott.

53.     Ms. Frey requested to have a meeting with Mr. Knowlton-Rau, Human Resources Manager Carin Peterson ("Ms. Peterson"), and Ms. Parrott so that they could address Ms. Parrott's actions and resolve any issues.

54.     Mr. Knowlton-Rau, Associate Executive Director Amy Yount ("Ms. Yount"), and Ms. Lunnon spoke with Ms. Parrott about Ms. Frey's complaints.

55.     Mr. Knowlton-Rau, Ms. Yount, and Ms. Lunnon did not speak with Ms. Frey regarding her complaints against Ms. Parrott.

56.     Ms. Parrott was not asked to re-sign the MorningStar Code of Civility.

57.     From this point on, a manager was present any time Ms. Parrott and Ms. Frey had to do a crossover.

58.     Ms. Frey began feeling increasingly anxious at work and often felt sick to her stomach in Ms. Parrott's and Ms. Larsen's presence.

59.     Mr. Knowlton-Rau did nothing to address or discipline Ms. Parrott despite her continued harassment of Ms. Frey.

60.     Ms. Parrott was transferred to the Boulder location approximately two weeks prior to Ms. Frey's constructive discharge.

61.     Kathleen Larsen ("Ms. Larsen") was a fellow concierge at the MorningStar RidgeGate location during Ms. Frey's employment.

62.     Ms. Larsen is a white female.

63.     Ms. Larsen continually harassed and discriminated against Ms. Frey because of her race and the color of her skin during Ms. Frey's employment with MorningStar.

64.     Ms. Larsen repeatedly referred to Ms. Frey as a "nigger."

65.     Ms. Frey learned of this from other MorningStar employees during her employment.

66.     Around Halloween in 2021, Ms. Larsen stated to several employees that Ms. Frey would not need to wear a costume because "she wears hers every day. She can just come as a white nigger."

67.     This comment was meant to refer to Ms. Frey vitiligo, a skin condition which causes loss of skin pigmentation.

68.     Johanna, a housekeeper at MorningStar, overheard Ms. Larsen's comment and informed Ms. Frey.

69.     Ms. Frey brought this to the attention of Mr. Knowlton-Rau, Ms. Yount, Ms. Peterson, and Ms. Perkins, but to her knowledge, no action was taken.

70.     Crystal Watson ("Ms. Watson"), an employee with a third-party cleaning company, overheard Ms. Frey being referred to as a "nigger" on several occasions by Ms. Larsen and Ms. Parrott.

71.     Ms. Watson reported this to Mr. Knowlton-Rau.

72.     Mr. Knowlton-Rau did not ask Ms. Watson to put her statement in writing or share it with Ms. Lunnon, Ms. Peterson, Ms. Yount, or Ms. Williams.

73.     Ms. Watson then gave a written statement to Ms. Frey about what she had witnessed because Ms. Watson felt that Mr. Knowlton-Rau had not taken her seriously.

74.     In her statement, Ms. Watson says that she has heard Ms. Larsen and Ms. Parrott refer to Ms. Frey as a "nigger" and use other hateful language on numerous occassions.

75.     Ms. Frey brought this complaint to Mr. Knowlton-Rau, but to her knowledge, no action was taken by Mr. Knowlton-Rau or Defendants.

76.     Ms. Larsen was not asked to re-sign the MorningStar Code of Civility.

77.     Mr. Knowlton-Rau did nothing to address or discipline Ms. Larsen despite her continued harassment of Ms. Frey.

78.     Mr. Knowlton-Rau assured Ms. Frey that her concerns were all being reported to upper management.

**Discrimination from Resident Bill Clark**

79.     In or around July 2021, Ms. Frey was working at the concierge desk when she heard Bill Clark ("Mr. Clark"), a resident of MorningStar, loudly state, "I never thought I would live to see the day that a black person would be at the [concierge] desk."

80.     Emma Warriner ("Ms. Warriner"), a caregiver at MorningStar, was present and heard Mr. Clark's comment.

81.     Gizem Demirtas ("Ms. Demirtas"), another caregiver, also heard Mr. Clark's comment.

82.     Ms. Demirtas and Ms. Warriner had both heard Mr. Clark refer to Ms. Frey as a "nigger" on multiple occasions.

83.     Both Ms. Demirtas and Ms. Warriner asked Mr. Clark not to make these kinds of comments about Ms. Frey.

84.     During her employment, Ms. Frey learned of these events.

85.     Ms. Warriner and Ms. Demirtas together reported these incidents to Donna Garcia Munoz ("Ms. Munoz"), Assisted Living Coordinator.

86.　　Ms. Munoz responded to the complaint by saying, in reference to Ms. Frey, "I'm old school just like Bill. If she is going to act like a nigger, then I'm going to treat her like a nigger.'"

87.　　Ms. Warriner reported this comment to Ms. Yount by email.

88.　　Ms. Warriner and Ms. Demirtas were instructed by Ms. Lunnon, Ms. Yount, and Ms. Peterson to sign a statement agreeing not to discuss Mr. Clark's use of the word "nigger" to refer to Ms. Frey.

89.　　Several months later, Ms. Munoz resigned her employment on September 8, 2021.

90.　　Mr. Clark continued to treat Ms. Frey discriminatorily due to her race and skin color, and no action was taken against Mr. Clark despite Defendants' written policies.

91.　　On one occasion, Mr. Clark asked Mr. Knowlton-Rau, "When are you going to get some decent help at the [concierge] desk?" referring to Ms. Frey. Mr. Knowlton-Rau did not respond to, correct, or admonish Mr. Clark or otherwise defend Ms. Frey.

92.　　On another occasion, Mr. Clark rudely snapped his fingers at Ms. Frey and demanded that she get him a napkin from the dining room and engaged in other discriminatory conduct against Ms. Frey.

93.　　On August 11, 2021, Ms. Frey complained about these incidents with Mr. Clark to Ms. Yount, Mr. Knowlton-Rau, and Wellness Director Misty Perkins ("Ms. Perkins") by email.

94.　　To Ms. Frey's knowledge, no action was taken as required by Defendants' policies.

95.　　MorningStar did not investigate Ms. Frey's complaints against Mr. Clark.

96.　　As late as October 21, 2021, another concierge, Jamie Beebe ("Ms. Beebe"), continued to hear Mr. Clark refer to Ms. Frey as a "nigger."

97.　　Ms. Beebe told Ms. Frey that Mr. Clark was still talking about her this way.

98.     MorningStar's residential living contract prohibits residents from discriminating against employees based on their race.

99.     No action was taken by MorningStar to prevent the continued discriminatory harassment by Mr. Clark against Ms. Frey.

**MorningStar Fails to Intervene**

100.    On one occasion, when a resident asked Ms. Frey if she was from Africa, Mr. Knowlton-Rau only laughed. Another resident had to step in to defend Ms. Frey.

101.    Mr. Knowlton-Rau instructed Ms. Frey to bring all of her concerns directly to him and no one else.

102.    Ms. Frey spoke to Mr. Knowlton-Rau on several occasions about the discrimination and harassment she was experiencing from Ms. Parrott, Ms. Larsen, and Mr. Clark.

103.    Mr. Knowlton-Rau assured Ms. Frey that her concerns were being shared with Ms. Lunnon.

104.    Despite her complaints, Mr. Knowlton-Rau, Ms. Lunnon, Ms. Yount, and Ms. Peterson did nothing to address or prevent the discrimination and harassment of Ms. Frey.

**MorningStar Retaliates Against Ms. Frey**

105.    On or around September 10, 2021, Mr. Knowlton-Rau informed Human Resources Generalist Diana Williams ("Ms. Williams") of Ms. Frey's complaints regarding Ms. Parrott, Ms. Larsen, and Mr. Clark.

106.    Ms. Williams met with Ms. Frey on September 10, 2021, to discuss what Ms. Williams called "issues," which had been reported to Ms. Williams by Mr. Knowlton-Rau.

107.    Ms. Williams did not clarify what she meant by "issues" when Ms. Frey asked.

108.   Ms. Frey informed Ms. Williams that Ms. Parrott and Ms. Larsen had been referring to her as a "nigger" and that nothing had been done despite Ms. Frey's complaints.

109.   Ms. Frey asked Ms. Williams why Ms. Parrott, Ms. Larsen, Mr. Clark, Mr. Knowlton-Rau, Ms. Lunnon, Ms. Peterson and/or Ms. Yount were not present in this meeting. Ms. Williams did not respond.

110.   Ms. Frey asked if Ms. Williams would talk to Ms. Parrott, Ms. Larsen, and Mr. Clark about their discriminatory behavior.

111.   In response, Ms. Williams asked Ms. Frey if she read the Bible and told her to "pray for those who have created the hostile work environment," meaning Ms. Parrott, Ms. Larsen, and Mr. Clark.

112.   Ms. Williams suggested that Ms. Frey could be a "teacher" for Ms. Parrott, Ms. Larsen, and Mr. Clark.

113.   Ms. Williams said that reading the Bible could help Ms. Frey overcome the hostile work environment she was experiencing.

114.   Ms. Williams stated that God had Ms. Frey at MorningStar for a reason.

115.   Ms. Williams said she could understand Ms. Frey's feelings because she was a "woman of color" herself.

116.   Ms. Williams and Defendants did not take corrective action against Ms. Parrott, Ms. Larsen, or Mr. Clark.

117.   Ms. Frey attempted to meet with Ms. Lunnon on or around September 15, 2021, to discuss the ongoing discrimination and harassment.

118.   Ms. Lunnon said she wanted to wait to meet with Ms. Frey until Mr. Knowlton-Rau, who was out with COVID-19, could be present.

119.    Ms. Lunnon left for vacation a few days later.

120.    When she returned, Ms. Lunnon did not attempt to arrange a meeting with Ms. Frey and Mr. Knowlton-Rau, as Ms. Frey had requested.

121.    On September 17, 2021, Ms. Yount and Ms. Peterson asked Ms. Frey to re-sign the MorningStar Code of Civility.

122.    Ms. Frey was the only employee asked to re-sign the Code of Civility at this time.

123.    Ms. Frey was told she needed to re-sign the Code of Civility because "someone" said Ms. Frey was speaking poorly about other employees and management.

124.    During this meeting, Ms. Frey expressed to Ms. Yount and Ms. Peterson that she was not feeling her "normal self" because the harassment from Ms. Parrott, Ms. Larsen, and Mr. Clark, as well as Mr. Knowlton-Rau and management's lack of response, was making her depressed.

125.    After this meeting, a housekeeper came over to Ms. Frey at the concierge desk and told her that she knew Ms. Frey was being referred to as a "nigger" by Mr. Clark, Ms. Parrott, and Ms. Larsen.

126.    On September 21, 2021, Ms. Frey received a final written warning from Ms. Lunnon, Ms. Peterson, and Ms. Williams.

127.    The warning cited gross misconduct and failure to comply with company policy and/or procedure.

128.    The warning was based on a complaint from Dining Room Manager Cassidy Jones ("Ms. Jones") and Ms. Yount.

129.    The complaint accused Ms. Frey of using profanity while speaking to Ms. Jones within earshot of residents on September 15, 2021.

130.    This complaint against Ms. Frey was false.

131.    Ms. Frey did not use profanity when speaking to her coworkers nor did she use profanity in her conversation with Ms. Jones.

132.    Ms. Frey requested that video footage of the incident be reviewed, but this request was ignored.

133.    Ms. Frey initially refused to sign the written warning because she had never behaved in the way that was being described in the warning.

134.    Ms. Frey informed Ms. Lunnon, Ms. Peterson, and Ms. Williams that a housekeeper had told her she knew Ms. Frey was still being called a "nigger" by Mr. Clark, Ms. Parrott, and Ms. Larsen.

135.    Ms. Lunnon, Ms. Peterson, and Ms. Williams did not respond.

136.    During this meeting, Ms. Lunnon, Ms. Peterson, and Ms. Williams spoke in a derogatory manner to Ms. Frey.

137.    Ms. Frey had to ask several times to receive a copy of the written warning and for it to be retracted. Ms. Lunnon, Ms. Peterson, and Ms. Williams agreed to give it to her only if she signed it.

138.    Several days after this meeting, Ms. Frey again met with Ms. Peterson.

139.    Ms. Frey asked Ms. Peterson to retract her final written warning because the accusations against her were untrue.

140.    Ms. Frey also informed Ms. Peterson about the day Ms. Parrott had yelled in her ear in Mr. Knowlton-Rau's office.

141.    Ms. Peterson was not made aware of this incident by Mr. Knowlton-Rau, Ms. Lunnon, or Ms. Yount.

142.    Ms. Peterson told Ms. Frey that she and Ms. Lunnon had looked at Ms. Parrott's timecards to determine whether or not she was coming back from her breaks late so that Ms. Frey would miss her rides home.

143.    Ms. Peterson confirmed that Ms. Frey was telling the truth.

144.    On two separate occasions, Ms. Frey asked Ms. Peterson to review the video footage of the area where the incident that prompted the written warning had occurred.

145.    To Ms. Frey's knowledge, Ms. Peterson did not review the video.

146.    Ms. Frey's final written warning was not retracted.

147.    Mr. Knowlton-Rau did not attend any of the meetings between Ms. Frey, Ms. Peterson, Ms. Lunnon, Ms. Yount, and/or Ms. Williams.

148.    Despite staff shortages, Ms. Frey's hours were reduced by more than thirty percent (30%) beginning in October of 2021 in retaliation for Ms. Frey's complaints against Ms. Parrott, Ms. Larsen, and Mr. Clark.

149.    During her employment with MorningStar, Ms. Frey received numerous letters of appreciation from residents, their families, and other employees.

150.    Ms. Frey never missed a shift and often took on additional shifts when asked.

151.    Ms. Frey even assisted Mr. Knowlton-Rau when he was out of town by performing the Director's job duties and working three double shifts to make sure there was coverage.

**Ms. Frey is Constructively Discharged**

152.    Ms. Parrott, Mr. Clark, Ms. Larsen, Ms. Munoz, Ms. Peterson, Ms. Lunnon, Ms. Yount, and Mr. Knowlton-Rau all contributed to the hostile work environment Ms. Frey experienced at MorningStar.

153.    Ms. Frey met with Assistant Director of Human Resources Claire Grimes ("Ms. Grimes") on November 5, 2021.

154.    Mr. Knowlton-Rau, Ms. Yount, and Ms. Lunnon were all unavailable to meet.

155.    Ms. Frey informed Ms. Grimes of the harassment and discrimination she had been experiencing.

156.    Caregiver Caroline Rust ("Ms. Rust") was present during this meeting and confirmed what Ms. Frey was reporting.

157.    Ms. Grimes stated that she would ask Ms. Frey to stay except she could not blame Ms. Frey for being forced to quit her employment.

158.    Ms. Grimes and Ms. Rust both signed statements confirming that they had met with Ms. Frey on November 5, 2021.

159.    The discrimination, harassment, and hostile work environment that Ms. Frey was continually subjected to constituted a constructive discharge of her employment.

160.    The term "constructive discharge" was used by Ms. Grimes several times during her meeting with Ms. Frey.

161.    Ms. Frey was constructively discharged on November 5, 2021.

### FIRST CLAIM FOR RELIEF
**(Race and Color Discrimination, Discriminatory Discipline and Wrongful Termination in violation of 42 U.S.C § 2000e-2)**

162.    Ms. Frey incorporates by reference and re-alleges each and every necessary allegation and claim for relief with the same force and effect as if fully set forth herein.

163.    At all relevant times to the allegations in this complaint, MorningStar was an employer within the meaning of and covered by 42 U.S.C. § 2000e(b).

164.    At all relevant times to the allegations in this complaint, Ms. Frey was an employee within the meaning of 42 U.S.C. § 2000e(f).

165.    Ms. Frey is an African American female, her skin color is black, and she is a member of a protected class under Title VII.

166.    At all times during her employment, Ms. Frey was performing at or above the level of MorningStar's reasonable expectations.

167.    Despite Ms. Frey's qualifications and performance, she was discriminated against because of her race and the color of her skin when she was wrongly disciplined and then constructively discharged from her employment.

168.    MorningStar discriminated against Ms. Frey in terms and conditions of her employment and engaged in the pattern and/or practice of discriminatory treatment on the basis of race and skin color in violation of 42 U.S.C. § 2000e-2 with respect to the privileges, conditions, benefits of employment, and separation from employment.

169.    Similarly situated employees were treated more favorably than Plaintiff.

170.    MorningStar is liable for the acts and omissions of its agents and employees. MorningStar either directly, or by and through its employees, discriminated against Ms. Frey when it constructively discharged Ms. Frey's employment on the basis of her race and skin color.

171.    MorningStar's acts were intentional, and it acted with malice, indifference, and a reckless disregard of Plaintiff's rights.

172.    The effect of the practices complained of has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her employment status because of her race and skin color.

173.    As a direct and proximate result of the intentionally discriminatory acts and practices of MorningStar, or its agents or employees, Plaintiff has suffered and will continue to suffer injury, including past and future loss of income and other employment benefits, severe emotional pain and suffering, mental anguish, loss of enjoyment of life, and other past and future pecuniary losses.

## SECOND CLAIM FOR RELIEF
### (Race and Color Discrimination, Retaliation in violation of 42 U.S.C § 2000e-3)

174.    Ms. Frey incorporates by reference and re-alleges each and every necessary allegation and claim for relief with the same force and effect as if fully set forth herein.

175.    At all relevant times to the allegations in this complaint, MorningStar was an employer within the meaning of and covered by 42 U.S.C. § 2000e(b).

176.    At all relevant times to the allegations in this complaint, Ms. Frey was an employee within the meaning of 42 U.S.C. § 2000e(f).

177.    Ms. Frey is an African American female, her skin color is black, and she is a member of a protected class under Title VII.

178.    Ms. Frey engaged in protected opposition to discrimination when she complained to management at MorningStar that she was being treated differently because of her race and skin color.

179.    Plaintiff made complaints to management and to the Human Resources offices of MorningStar.

180.    MorningStar unlawfully retaliated against Ms. Frey by reducing her work hours.

181.    MorningStar constructively discharged Ms. Frey effective on November 5, 2021.

182.   Ms. Frey was constructively discharged by MorningStar in retaliation for making complaints to management about racial and skin color discrimination in the workplace in violation of 42 U.S.C § 2000e-3.

183.   MorningStar committed an unlawful act of retaliation by limiting, segregating, or classifying Plaintiff, adversely affecting her, including identifying Plaintiff for discrimination and harassment because of her complaints raised about her treatment due to her race and skin color.  A reasonable employee would have found the actions Plaintiff challenged materially adverse.

184.   There exists a causal relationship between Plaintiff's acts in opposition to discrimination and her discipline and constructive discharge.

185.   The effect of the practices complained of has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her employment status because of her race and skin color.

186.   MorningStar acted with malice or reckless disregard of Ms. Frey's federally protected rights with knowledge it was acting in violation of federally protected rights.

187.   As a direct and proximate result of the intentionally discriminatory acts and practices of MorningStar, or its agents or employees, Plaintiff has suffered and will continue to suffer injury, including past and future loss of income and other employment benefits, severe emotional pain and suffering, mental anguish, loss of enjoyment of life, and other past and future pecuniary losses.

**THIRD CLAIM FOR RELIEF**
**(Race and Color Hostile Work Environment in Violation of 42 U.S.C. § 2000e-2)**

188.   Ms. Frey incorporates by reference and re-alleges each and every necessary allegation and claim for relief with the same force and effect as if fully set forth herein.

189.    At all relevant times to the allegations in this complaint, MorningStar was an employer within the meaning of and covered by 42 U.S.C. § 2000e(b).

190.    At all relevant times to the allegations in this complaint, Ms. Frey was an employee within the meaning of 42 U.S.C. § 2000e(f).

191.    Ms. Frey is an African American female with black skin color.

192.    Ms. Frey was subjected to repeated and severe harassment based on her race and skin color that altered the terms, privileges, and conditions of Plaintiff's employment, including the separation of her employment.

193.    The conduct that she and others complained of was unwelcome and offensive.

194.    The conduct was directed at Plaintiff because of her race and skin color.

195.    Defendants knew or should have known of the conduct and failed to take immediate and effective measures to prevent the conduct from occurring and continuing even after it received Plaintiff's and coworker's complaints.

196.    MorningStar acted with malice or reckless disregard of Ms. Frey's federally protected rights with full and complete knowledge that the behavior was in violation of federal law.

197.    As a direct and proximate result of the intentionally discriminatory acts and practices of Defendants, Plaintiff has suffered and will continue to suffer injury, including past and future loss of income and other employment benefits, severe emotional pain and suffering, mental anguish, loss of enjoyment of life, and other past and future pecuniary losses.

### FOURTH CLAIM FOR RELIEF
### (Discrimination, Harassment, and Retaliation in violation of 42 U.S.C. § 1981)

198.    Ms. Frey incorporates by reference and re-alleges each and every necessary allegation and claim for relief with the same force and effect as if fully set forth herein.

199.    Ms. Frey is an African American female with black skin color.

200.    Defendants discriminated against Ms. Frey in the terms and conditions of her employment on the basis of her ancestry and ethnic characteristics in violation of 42 U.S.C. § 1981, including but not limited to the following:

      a.    Illegally treating Ms. Frey disparately from white employees to make and enforce contracts because of her ancestry, ethnic characteristics, and/or skin color;

      b.    Declining to offer or permit Ms. Frey the same employment opportunities, benefits, privileges, terms, and conditions of the employment contractual relationship as white employees because of her ancestry, ethnic characteristics, and/or skin color;

      c.    Failing to permit Ms. Frey to make and enforce contracts by decreasing her hours because of her ancestry, ethnic characteristics, and/or skin color;

      d.    Permitting persons to modify her contract through harassment and discrimination against Ms. Frey and demonstrating favoritism toward persons not of color because of her ancestry, ethnic characteristics, and/or skin color;

      e.    Failing and refusing to take action to correct the effect of the discriminatory policies and practices complained of herein and/or failing to follow any corrective action because of her ancestry, ethnic characteristics, and/or skin color; and

      f.    Constructively discharging Ms. Frey's employment because of her ancestry, ethnic characteristics, and/or skin color.

201.    Ms. Frey was subject to severe and pervasive harassment such that it altered the conditions of her work environment.

202.    The harassment was unwelcome.

203.    The harassment was directed at Ms. Frey because of her ancestry, ethnic characteristics, and/or skin color.

204.    Ms. Frey complained about the harassment she endured but it persisted unabated.

205.    MorningStar failed to take appropriate remedial or preventive action.

206.    Ms. Frey suffered tangible employment decisions and acts.

207.    MorningStar is liable for the discrimination and harassment because it knew or should have known of the harassment and failed to take remedial action.

208.    MorningStar, either directly or by and through its agents, created a hostile work environment involving harassment, wherein Ms. Frey suffered the injuries stated herein.

209.    The acts alleged against MorningStar denied Ms. Frey the full and equal benefit of the laws as enjoyed by white citizens, and MorningStar engaged in acts impairing Ms. Frey's rights protected under law.

210.    MorningStar acted with malice or reckless disregard of Ms. Frey's federally protected rights with knowledge it was acting in violation of federally protected rights.

211.    As a direct and proximate result of the intentionally discriminatory acts and practices of MorningStar, or its agents or employees, Plaintiff has suffered and will continue to suffer injury, including past and future loss of income and other employment benefits, severe emotional pain and suffering, mental anguish, loss of enjoyment of life, and other past and future pecuniary losses.

WHEREFORE, Plaintiff respectfully requests the Court to find in her favor and against Defendants and grant the following relief:

a)    Award Plaintiff Ms. Frey all damages to which she is entitled, including, but not limited to, back pay, front pay, and benefits pursuant to applicable laws, including without limitation 42 U.S.C. §§ 2000e-2, 2000e-3, and 42 U.S.C. § 1981(a);

b)  Award Plaintiff compensatory and punitive damages against Defendants pursuant to applicable statutes, including those permitted under 42 U.S.C. §1981(a);

c)  Award attorneys' fees and costs pursuant to applicable statutes, including, without limitation to the fullest extent permitted by law, 42 U.S.C. § 2000e-5(k), and 42 U.S.C. §§ 1981, 1981(a) and (b), and 1988;

d)  An award for pre-judgment and post judgment interest to the fullest extent permitted by law; and

e)  Grant Plaintiff Ms. Frey such other equitable and further relief as to this Court appears necessary and proper, including such relief available under 42 U.S.C. § 2000e-5(f) and 42 U.S.C. § 1981(a).

## **Demand for Jury Trial**

Plaintiff, Janis Frey, hereby demands a trial by jury.

s/ Thomas J. Arckey
*Thomas J. Arckey*
ARCKEY AND ASSOCIATES, LLC
6860 S. Yosemite, Suite 2000
Centennial, CO 80112
(303) 798-8546
Email: tja@arlaw.us
Attorney for Plaintiff